**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FLOYD DAMREN,

      Petitioner,

v.                                CASE NO.  3:03-cv-397-J-32JRK

SEC'Y, FLA. DEP'T
OF CORR., et al.,

      Respondents.

_____

## ORDER

### I. Status

      This is one of a number of troubling capital cases in this Court in which federal habeas counsel failed to file the federal habeas petition on time.  The Court previously, but reluctantly, dismissed this Petition due to untimeliness.  Thomas [and Damren] v. McDonough, 452 F.Supp.2d 1203 (M.D. Fla. 2006).  However, faced with a trio of untimely cases and unsettled precedent, the Court later granted Petitioner's motion for rehearing and set the case for an evidentiary hearing on the issues of timeliness and equitable tolling. (Doc. #86).  On February 21, 2008, the Court conducted the evidentiary hearing.  (Doc. #107).  On January 20, 2009, the Court entered an Order (Doc. #125) dismissing the Petition, again finding that equitable tolling was not appropriate under the holdings in Downs v. McNeil, 520 F.3d 1311 (11th Cir. 2008) (finding that, if proven, petitioner's allegations of his unequivocal, repeated demands that his attorneys file his habeas petition, his close tracking of his

attorneys' work and the applicable federal deadlines, and his counsels' overt deception in representing that they had filed a tolling petition in state court, established circumstances so extraordinary, conduct so diligent, and misconduct so far outside his control as to merit equitable tolling), and Holland v. Florida, 539 F.3d 1334 (11th Cir. 2008) (finding that equitable tolling is not available in the absence of any credible proof of bad faith, dishonesty or mental impairment on the part of the petitioner's counsel).

Petitioner appealed, and the Eleventh Circuit remanded this case to this Court (Doc. #137) for reconsideration in light of the United States Supreme Court's intervening decision in Holland v. Florida, 130 S.Ct. 2549, 2564 (2010) (finding that while the circumstances of a case must be extraordinary to warrant equitable tolling, the condemned prisoner's attorney need not exhibit any bad faith, dishonesty, divided loyalty, mental impairment or the like for the attorney's unprofessional conduct to rise to the level of such an extraordinary circumstance).

Both parties asserted, and this Court agreed, that there was no need for this Court to conduct another evidentiary hearing.  However, the Court found that supplemental briefing was appropriate.  Each party has now submitted a brief addressing whether equitable tolling is warranted in light of Holland.  See Supplemental Briefing Following Holland (Doc. #143); Petitioner's Reply Brief Regarding Holland (Doc. #144).  Thus, this case is ripe for review of the equitable tolling issue.

## II. The Limitation Period

In the first order dismissing this case, the Court explained why this case was not timely filed.

2

After a jury trial, Petitioner Damren was convicted of first degree murder, armed burglary and aggravated assault and was sentenced to death, life imprisonment and ten years imprisonment, respectively.  On direct appeal, the Supreme Court of Florida affirmed the conviction and sentences on May 8, 1997.  Damren v. State, 696 So.2d 709 (Fla. 1997); Ex. B. Rehearing was denied on July 8, 1997.  Ex. C.  The mandate was issued on August 7, 1997.  Ex. D.  On January 12, 1998, the United States Supreme Court denied Petitioner's petition for writ of certiorari.  Damren v. Florida, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998); Ex. E.

Respondents contend, and this Court agrees, that Petitioner has not complied with the one-year period of limitation as set forth in 28 U.S.C. § 2244(d).  See Respondents' Motion for Summary Judgment. Petitioner's conviction became final on January 12, 1998, when the United States Supreme Court denied his petition for writ of certiorari.  This was after the April 24, 1996, effective date of the AEDPA. Therefore, AEDPA's one-year limitation period began to run on January 13, 1998. Thus, Petitioner should have filed this action on or before January 12, 1999.  The Petition, filed in this Court on November 24, 2003, would be untimely unless Petitioner Damren could avail himself of one of the statutory provisions which extends or tolls the time period.

The one-year period of limitation ran for 300 days (January 13, 1998, to November 8, 1998) until Petitioner Damren, through counsel,[1] filed a Motion to Vacate Judgment and Sentence with Special Request for Leave to Amend pursuant to Fla. R. Crim. P. 3.851 on November 9, 1998. Ex. F. On July 2, 2000, he filed an amended Rule 3.851 motion, raising twenty-six (26) claims.  On April 10, 2001, the circuit court conducted an evidentiary hearing, and on June 20, 2001, the trial court denied the amended Rule 3.851 motion.  Ex. G. Petitioner appealed to the Supreme Court of Florida and during the pendency of the appeal, Petitioner also filed a petition for

---

[1] Jefferson W. Morrow, Esquire, represented Petitioner in his state post-conviction proceedings and in these proceedings until this Court relieved him from further representation in this case at the February 21, 2008 evidentiary hearing.  See Transcript of the February 21, 2008 Evidentiary Hearing (Doc. #107) (hereinafter EH Tr.) at 165.

writ of habeas corpus in the Supreme Court of Florida. On January 23, 2003, the Supreme Court of Florida affirmed the lower court's denial of his Rule 3.851 motion and denied the petition for writ of habeas corpus. Damren v. State, 838 So.2d 512 (Fla. 2003); Ex. I. The mandate was issued on February 24, 2003. Ex. J.

The one-year period of limitation was tolled during the pendency of Petitioner's Rule 3.851 motion from November 9, 1998, until February 24, 2003. The one-year period of limitation started running again the next day, on February 25, 2003.

Therefore, since 300 days of the one-year period of limitation had already run, Petitioner's habeas corpus petition in this Court should have been filed within sixty-five (65) days. In sum, Petitioner's federal petition was due on April 30, 2003. However, instead of timely filing a federal petition for writ of habeas corpus, Petitioner, through counsel, filed a Motion for Leave to Proceed *In Forma Pauperis*, on May 14, 2003, in this Court. By that time, however, the limitation period had already expired. (Of course, this Court would have had no way of knowing that at the time unless it had undertaken its own independent investigation of the state court proceedings - a role courts do not usually perform.)

After a total of 572 days had elapsed, Petitioner filed the Petition in this Court on November 24, 2003. The time kept running because if a petitioner files a motion to proceed *in forma pauperis* in federal court, the one-year period of limitation continues to run until an actual petition for writ of habeas corpus is filed. See Woodford v. Garceau, 538 U.S. at 208, 123 S.Ct. 1398 (holding that a federal habeas case commences with the filing of an application for habeas corpus relief); Stafford v. Thompson, 328 F.3d at 1305 (citing Woodford for the proposition that a case does not become "pending" until the actual application for habeas corpus relief is filed in federal court); Isaacs v. Head, 300 F.3d at 1245 (finding "the relevant date for purposes of judging AEDPA's applicability to a habeas petition is the date on which the actual § 2254 petition was filed."); Lookingbill v. Cockrell, 293 F.3d at 263. Thus, this action is due to be dismissed because it was filed after the expiration of the federal one-year period of limitation.

Thomas, 452 F.Supp.2d at 1221-22 (footnotes omitted).  Faced with this untimely filing, the only remaining question was whether equitable tolling could save the Petition.

### III.  Evidentiary Hearing Testimony

At the evidentiary hearing, Petitioner testified that, after his direct appeal in 1998, Jefferson W. Morrow, a registry lawyer, was appointed to represent Petitioner in his state post-conviction proceedings because Petitioner was not financially able to hire his own lawyer. EH Tr. at 168-69.  Petitioner did not participate in the selection of Mr. Morrow as his attorney. Id. at 168.  Petitioner relied upon Mr. Morrow to handle his case since Petitioner is "not real familiar with the law" and how legal proceedings work. Id. at 169, 170.  Petitioner had no knowledge of "how motions to set aside can be filed and when they are due[.]" Id. at 170.  Petitioner never had any reason to believe that Mr. Morrow was not protecting his rights. Id.  Petitioner "thought [Mr. Morrow] had [the case] covered." Id.

Mr. Morrow testified that a state court judge appointed him to represent Petitioner because "they needed somebody quickly on the case" and he "was probably one of the only [registry attorneys] in Jacksonville at that time . . . ." Id. at 172.  While Mr. Morrow represented several defendants in capital cases and appeals in state court, Mr. Damren's death penalty case was the first federal habeas action he had handled. Id. at 173-74.  Mr. Morrow "was not familiar with federal court . . . ." Id.  Although he knew federal review was available, he "sincerely thought" there would be "some mechanism" that would provide legal assistance to him in federal court. Id. at 174, 187.  Sometime after February 24, 2003, Mr. Morrow told Petitioner that, while he was not familiar with federal habeas corpus review, he

5

would continue to represent him, but would need assistance in federal court. Id. at 176, 183, 186-87.[2]

Mr. Morrow called Petitioner's trial counsel, but he "didn't know what to do." Id. at 181. Thereafter, Mr. Morrow called other lawyers to try to get help in filing the federal habeas petition. Id. at 181-82.

Mr. Morrow thought that filing a petition for writ of certiorari in the United States Supreme Court in April 2003 (to seek review of the Florida Supreme Court's opinion affirming the denial of Mr. Damren's motion for post-conviction relief and denying his state habeas petition) would toll the one-year federal limitation period and "give [him] another 90 days or so." Id. at 189. At that time, he did not know about the Coates[3] case. Id. at 181. Mr. Morrow described "a comedy of errors" that resulted in the untimely filing of the petition for writ of certiorari. Id. at 175. Mr. Morrow thought the petition had been mailed to the United States Supreme Court, with "a week left" before the period in which to do so expired. Id. He described what happened next:

> And the next day I checked it and my office had sent it to the Florida Supreme Court [instead of the United States Supreme Court].
>
> So I called the Florida Supreme Court clerk and gave them my FedEx account number and they said, No problem,

---

[2] When he sought appointment in this federal case, Mr. Morrow (who is now deceased) stated that he had the requisite qualifications to represent Petitioner, and after a hearing, the Court so found. See Order (Doc. #33).

[3] Coates v. Byrd, 211 F.3d 1225, 1227 (11th Cir. 2000) (per curiam) (finding the limitations period is not tolled during the pendency of a petition for writ of certiorari challenging a state court's denial of a motion for post conviction relief).

we'll send it to the U.S. Supreme Court.  And I said, We got a week left.  And they said, No problem.  And they did not send it timely.

I can't blame them though.  And so what happened is they received it two days late.  And so we never even got in to the United States Supreme Court.

Id.

When Mr. Morrow discovered that the United States Supreme Court received his petition for writ of certiorari late, he was not certain whether the federal one-year time limitation had run.  Id. at 189.  In the summer of 2003, Mr. Morrow told Petitioner about the mistake he had made in April of 2003 with respect to mailing the petition for writ of certiorari to the Florida Supreme Court rather than the United States Supreme Court, and Petitioner understood what had happened.  Id. at 176-77, 178, 189.

Mr. Morrow testified that he decided to represent Petitioner "because somebody had to."  Id. at 178.  He described Petitioner as "a good client," noting that he is "bright," that he has a "good rapport" with Petitioner and that they communicate with each other "very easily . . . ."  Id. at 178, 190.  However, in comparing Petitioner Damren to Mr. Morrow's approximately seven-thousand other clients over the years he has practiced law, Mr. Morrow opined that Petitioner's ability to comprehend legal advice about case procedures is "way at the bottom."  Id. at 190.  Mr. Morrow testified that Petitioner did not understand timing or issues in the case.  Id. at 187, 190.  Mr. Morrow affirmed that Petitioner appeared to understand when Mr. Morrow explained the problems in the progression of the case.  Id. at 191.

After the state court proceedings had ended on February 24, 2003, Mr. Morrow "wanted someone to pick up and take over" the case. Id. at 183. The conversations between Mr. Morrow and Mr. Damren (occurring after February 24, 2003, but before the filing deadline of April 30, 2003) did not specifically address the deadline to file the federal habeas corpus petition or any issues regarding the timing of the federal petition, but rather centered upon Mr. Morrow's need for legal assistance in federal court. Id. at 182-83. Specifically, he told Petitioner he had "never done" a federal death penalty case, that he did not know how to proceed in federal court, but would continue to represent him and "get somebody to help him." Id. at 183, 186-87. From May of 2003, until November 24, 2003, when Mr. Morrow filed the federal petition, Mr. Morrow and Petitioner continued to discuss the case. Id. at 186. Mr. Morrow testified that, when he talked to Petitioner about seeking the assistance of a lawyer who had federal experience, Petitioner agreed he should seek the assistance of a federal attorney. Id. at 178-79. Mr. Morrow noted that Petitioner relied on his representation "100 percent" to understand the issues in the case. Id. at 191.

Mr. Morrow testified further regarding this issue:

> THE COURT: . . . [D]id you tell [Damren], though, that you were trying to either get somebody or that you were . . . trying to handle the federal matter in some way or another?
>
> THE WITNESS: Yes, sir, I did. . . . [T]o be fair to him, I'm sure he thought that I was taking care of it and I was just going to get somebody else to help me. Because in his mind he's thinking of the attorney on the outside, I'm stuck here. So to be fair to him is, yes, I -- to him it was, yeah, okay. I'll stay on it, but I'll get somebody else to help me.
>
> THE COURT: Would [Damren] have any reason in your mind to think that he himself needed to file a petition himself to

8

> preserve timeliness or to affirmatively go out and get . . . another lawyer to do it for him?
>
> THE WITNESS:  That really didn't cross my mind so much, because he was there, was stuck there.  And it just seemed to me it was too difficult for him to do anything on his behalf.  And he didn't understand the timing anyway.  And so, you know, I didn't expect him to do that.

Id. at 187-88.

Mr. Morrow explained that he was not familiar with the timing requirements of the federal one-year limitation period.  Id. at 183.  He started to calculate the federal one-year deadline several times, but in conferring with other people, he "got very confusing advice." Id. at 184.  Therefore, he "did not get an exact date figured out." Id.  On May 14, 2003, when Mr. Morrow filed the first document in this Court (the Motion for Leave to Proceed *In Forma Pauperis*), he "was not 100 percent sure," but believed, after conferring with others, that he had enough time and that the filing of the *in forma pauperis* motion would stop the clock.  Id. at 177, 185.  At the time Mr. Morrow filed the Petition on November 24, 2003, he did not know if the Petition was timely or not.  Id. at 185-86.

Mr. Morrow explained why he missed the one-year deadline for filing the Petition in federal court.

> I thought I had enough time.  I know that sounds stupid.  But I thought I had -– I thought there was enough time.
>
> I have some explanations for it, in that every person I contacted said, [d]on't worry, Mark Olive will help you, because he's federally funded.  And after 30 phone calls and no return phone call -– even to this day, I've never talked to Mark Olive, or received a letter from him -- I had no relief, or anyone trying to help me.

> Because I did not understand federal practice for the -- for a federal habeas.  You can probably tell that by looking at the first motion I filed.  So, I mean, that's my explanation.

Id. at 177-78.

### IV. The Court's Decision

When I dismissed this Petition as untimely the first time, I took the liberty of prefacing

that decision as follows:

> Before the Court are three capital cases which all present the same troubling question: when counsel appointed by this very Court to represent capital habeas petitioners fail to file the habeas petitions on time, does the petitioner have any remedy?  Based on my reading of current Eleventh Circuit precedent, the answer is no.  In this opinion I so rule.  However, because of the importance of this issue, not only to the affected petitioners, but to this Court as well, I think it appropriate to share some thoughts.

> First, I have no idea whether any of these petitioners have meritorious federal habeas claims.  Because the petitioners are not asserting actual innocence and because I have found the claims time-barred, I have not looked at the merits. Certainly, the state courts in each case have concluded, after painstaking review, that the death sentences are proper. But, the law provides for federal habeas review in capital cases and this Court is therefore obliged to provide due and proper process to these petitioners.

> Second, at least in this part of Florida, there appears to be a tremendous shortage of attorneys who will admit to being experts in federal habeas procedures and who will agree to be appointed to these cases.  Most often, whomever represented petitioners in the state collateral proceedings will agree, sometimes reluctantly, to handle the federal work even if not well-versed in the federal habeas statute and limitations period.

> Third, the one-year federal limitations period is, as in these cases, often fairly close to running immediately upon the completion of state post conviction proceedings, putting

10

pressure on post conviction counsel to file a timely federal petition.

Fourth, in these cases, the Court agreed to appoint these counsel, at their request, upon what the Court at the time thought was a sufficient showing of expertise to be able to properly prosecute the cases. Obviously, if the Court had known then that these counsel would (or in one case already had) miss the federal limitations deadline, it would not have appointed them (assuming the Court had any other option available).

Fifth, counsel in these cases really have no good reason or explanation for their failure to file on time. I suppose both counsel should be commended on the one hand for stepping into the breach of capital litigation, where relatively few lawyers will tread. But having said that, it is hard for me to fathom how a lawyer who asked for and received the appointment of this Court, could abdicate the most basic function of filing the petition on time, even if it is "bare-bones."

Sixth, while acknowledging that Eleventh Circuit precedent places responsibility for timeliness on the petitioner himself, there are real practical concerns. If capital petitioners were able to navigate the shoals of federal habeas litigation without assistance, there would be no need to appoint counsel in the first place. Yet, federal law provides for appointment and payment of counsel in federal habeas capital cases, thereby acknowledging the necessity of such counsel. See 18 U.S.C. § 3599(a)(2). Moreover, once counsel is appointed, a petitioner should be able to rely on that counsel to, if nothing else, file his petition on time. Finally, this Court's procedures mandate that once counsel is appointed, the petitioner may only file pleadings *through counsel*. Indeed, the Court routinely strikes and returns *pro se* filings of parties who are represented by counsel. So, even a savvy petitioner, who may see the clock running out on his habeas time, can only cajole (and in one case plead with) his counsel to file the petition timely.

I recognize the sound legal and policy reasons which underpin the Eleventh Circuit's decisions on this issue and, even if I did not, I am no less bound by them. Nevertheless, I would be remiss if I did not share my deep concern that in these cases

11

> our federal system of justice fell short in the very situation where the stakes could not be higher.

Thomas, 452 F.Supp.2d at 1205-07 (footnote omitted).   Judge Barkett, in her later concurring opinion in Hutchinson v. Florida, 677 F.3d 1097, 1103-11 (11th Cir. 2012), made many of these same points, but more eloquently.

Following the evidentiary hearing, while I found Petitioner's counsel's conduct to be "grossly negligent," Order (Doc. #125) at 5, I again felt compelled by precedent to dismiss the Petition, but included these observations:

> I currently have before me three capital habeas petitioners, Damren, Asay and Thomas, all of whom were represented by lawyers who failed to timely file their federal habeas petitions. I conducted a joint evidentiary hearing for these three petitioners. In my estimation, this Petitioner, Damren, was the most trusting of his counsel and the least able to advocate on his own behalf. Yet it is partly because of Damren's failure to comprehend his own situation, understand the timing requirements and insist that his attorney do the most basic task of filing the petition on time that Damren finds himself disqualified from any consideration of equitable tolling.

Id. at 6-7. On appeal, the Eleventh Circuit directed me to reconsider this decision in light of the Supreme Court's intervening decision in Holland.

It should be obvious by now that if I, as a Court sitting in equity, were free to do so, I would find equitable tolling to apply in this case.[4] And, perhaps the Eleventh Circuit has

---

[4] I would also be inclined to consider whether Petitioner's statutory right to counsel under 18 U.S.C. § 3599(a)(2) has been violated by the Court's inadvertent failure to appoint an attorney of basic competence to represent Petitioner in his capital federal habeas proceeding. However, neither the United States Supreme Court nor the Eleventh Circuit has seemed to countenance this contention. Cf. Hutchinson, 677 F.3d at 1107-08 (Barkett, J. concurring) (noting that "[t]he reality of the quality of post-conviction death penalty representation available to indigent inmates on death row does not meet the Supreme

given me an opening to do so by remanding this case.[5]  But the Eleventh Circuit has also

warned in this precise context that when this Court is considering its equitable powers it is

still "bound by precedent to the extent that there is precedent."  Hutchinson v. Florida, 677

F.3d at 1099 (footnote omitted).[6]  Reviewing Holland and the post-Holland United States

Supreme Court and Eleventh Circuit cases on equitable tolling, the Court must again

conclude that there can be no equitable tolling here.

     "Holland held that 'a [habeas] petitioner is entitled to equitable tolling only if he shows

(1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstance stood in his way and prevented timely filing.'"  McQuiggin v. Perkins, 133 S.Ct.

1924, 1931 (2013) (quoting Holland, 130 S.Ct. at 2562).  The diligence required of a

petitioner for equitable tolling purposes is "reasonable diligence," not "maximum feasible

diligence."  Holland, 130 S.Ct. at 2565 (internal quotation marks and citations omitted).

Although "a garden variety claim of excusable neglect," such as a simple "miscalculation"

that leads a lawyer to miss a filing deadline, does not constitute an extraordinary

circumstance that would warrant equitable tolling, an attorney need not exhibit any bad faith,

dishonesty, divided loyalty, mental impairment or the like for the attorney's unprofessional

---

Court's recognition that Congress intended these inmates to have access to 'quality legal
representation' when it mandated the statutory right to counsel") (citations omitted).

     [5] Though in remanding the case, the Eleventh Circuit said it was expressing no view
"whether, under the Holland decision, equitable tolling would be appropriate under the facts
of this case."  Order (Doc. #137) at 2.

     [6] In Hutchinson, 677 F.3d at 1098-1103, the court found that equitable tolling was not
appropriate.

conduct to rise to level of such an extraordinary circumstance. Id. at 2564 (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990), and Lawrence v. Florida, 549 U.S. 327, 336 (2007)). "The burden of proving circumstances that justify the application of the equitable tolling doctrine rests squarely on the petitioner." San Martin v. McNeil, 633 F.3d 1257, 1268 (11th Cir. 2011).

Regarding due diligence, Petitioner was "not real familiar with the law" or how to go about filing the habeas petition or determining when it was due. EH Tr. at 169. He never had any reason to believe that his lawyer was not protecting his rights. He thought his lawyer "had [the case] covered." Id. at 170. In short, he trusted his lawyer. Mr. Morrow testified that, while Mr. Damren was "bright," id. at 190, his ability to comprehend legal advice was "way at the bottom" of his thousands of previous clients. Id. Morrow also said that Damren relied on him "100 percent" to provide proper representation. Id. at 191. Mr. Morrow would not have expected Damren to do anything more to protect his habeas rights.

As I read Holland and post-Holland precedent, this is just not good enough. For example, in Myers v. Allen, 420 F. App'x 924, 927 (11th Cir. 2011) (per curiam), the Eleventh Circuit addressed the following question: "Can a petitioner who is not mentally retarded and who has exercised no diligence at all be considered to have exercised reasonable diligence?" In answering this question, the Eleventh Circuit noted, "[u]nder our law, Myers's failure to allege that he took any steps to attempt to advance or monitor his case is fatal to his equitable tolling argument." Id. Specifically, the court found:

> Myers bears the burden of presenting "evidence showing reasonable efforts to timely file his action." Dodd v. United States, 365 F.3d 1273, 1277 (11th Cir. 2004) (citing Drew v.

> Dep't of Corr., 297 F.3d 1278, 1286–89 (11th Cir. 2002)). Myers need only show "an appropriate degree of diligence for someone in his situation." Dodd, 365 F.3d at 1283. Efforts reasonably expected of one petitioner might be unattainable for another. See Hunter v. Ferrell, 587 F.3d 1304, 1309–10 (11th Cir. 2009) (holding that petitioner's mental retardation could entitle him to equitable tolling if he demonstrates a "causal connection" between his delay and his intellectual disability). Myers claims that his cognitive impairments and reliance on counsel who had abandoned him made it reasonable for Myers to do nothing until he learned that his execution was scheduled. Although Myers's circumstances do yield a very low bar for what level of diligence is reasonable, he still bears the burden of showing he did something to at least attempt to inquire into the status of his case. We find no clear error in the district court's relevant factual findings and cannot say that the court erred in concluding that Myers is not entitled to equitable tolling because he failed to demonstrate any diligence at all.

Id. at 927-28.

In short, Petitioner's failure to personally take any steps to attempt to ensure the timely filing of his Petition precludes equitable tolling in his case. See Melson v. Comm., Ala. Dep't of Corr., 713 F.3d 1086, 1089 (11th Cir. 2013) (per curiam) (finding that a death row habeas petitioner failed to exercise reasonable diligence, as required for equitable tolling of the one-year limitation period, when he "took no independent steps to ensure that his federal habeas petition was timely filed"); Hutchinson, 677 F.3d at 1103 (finding that Hutchinson was not entitled to equitable tolling because he did not show that he pursued his rights diligently where "he had in hand a petition that he could have re-labeled and filed *pro se* in federal court within three weeks after the one-year limitations period ran, but he waited three-and-three-quarter years before he filed a *pro se* federal habeas petition"); Chavez v. Sec'y Fla. Dept. of Corr., 647 F.3d 1057, 1072 (11th Cir. 2011) (finding that equitable tolling

15

was not appropriate where the petitioner "failed to allege that [he] acted with diligence in pursuing his rights during [the pertinent] period, which is another requirement for equitable tolling").

Even assuming Petitioner could demonstrate the requisite diligence, Mr. Morrow's failure to ascertain the filing deadline and to timely file the Petition are not extraordinary circumstances that would justify equitable tolling.  Holland states that an attorney's failure to timely file a petition, coupled with the attorney's failure to ascertain the filing deadline, constitutes simple negligence which would not warrant equitable tolling.  See Holland, 130 S.Ct. at 2564 ("To be sure, Collins failed to file Holland's petition on time and appears to have been unaware of the date on which the limitations period expired-two facts that, alone, might suggest simple negligence."); id. at 2567, Alito, J., concurring ("While Lawrence[7] addressed an allegation of attorney miscalculation, its rationale fully applies to other forms of attorney negligence.  Instead of miscalculating the filing deadline, for example, an attorney could compute the deadline correctly but forget to file the habeas petition on time, mail the petition to the wrong address, or fail to do the requisite research to determine the applicable deadline. In any case, however, counsel's error would be constructively attributable to the client.").

This is not a case like the misconduct in Downs or Maples v. Thomas, 132 S.Ct. 912, 922 (2012) (finding that Maples had shown ample cause to "excuse the procedural default into which he was trapped when counsel of record abandoned him without a word of

---

[7] In Lawrence v. Florida, 549 U.S. at 336, the Court held that an attorney's mistake in miscalculating the limitations period was not sufficient to warrant equitable tolling.

warning")  where Mr. Morrow abandoned his client[8] or lied to him regarding the status of his case.[9]  Nor is this a case, like <u>Holland</u>, where the attorney failed to communicate with his client and keep him informed of the status of his case.  On the contrary, Mr. Morrow met with his client, had a good rapport with him, talked to him about the status of his case, and candidly admitted that he had never handled a federal death penalty case.

Moreover, this case does not involve a complete lack of effort in determining the limitations period; Mr. Morrow made some attempts to find an attorney to assist him without success.   If Mr. Morrow had conducted rudimentary legal research, he could have ascertained the limitations period himself.  However, under prevailing law, his failure to do so is insufficient to warrant equitable tolling.  <u>See</u> <u>Holland</u>, 130 S.Ct. at 2564, 2567; <u>Lawrence</u>, 549 U.S. at 336; <u>Smith v. Comm., Ala. Dep't of Corr.</u>, 703 F.3d 1266, 1271 (11th Cir. 2013) (per curiam) (finding that the petitioner had not demonstrated an "extraordinary circumstance" prevented him from timely filing and noting that "[a]s to exceptional circumstances, the general rule is that 'when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish

---

[8] While Petitioner argues that Mr. Morrow effectively abandoned Petitioner by failing to determine the deadline to file the Petition, this is not the type of "abandonment" that the Supreme Court addressed in <u>Maples</u>.

[9] "Affirmative misrepresentations by counsel about the filing of a state habeas petition can constitute extraordinary circumstances that warrant equitable tolling."  <u>Roper v. Dep't of Corr.</u>, 434 F. App'x 786, 790 (11th Cir. 2011) (per curiam) (citing <u>Downs</u>, 520 F.3d at 1325) (vacating a district court's order dismissing a habeas petition as untimely where the petitioner alleged that his attorney made affirmative misrepresentations about the filing of a state habeas petition that would have tolled the limitations period).  In this case, there is no evidence that Mr. Morrow ever made similar misrepresentations to Damren.

cause'") (quoting <u>Maples</u>, 132 S.Ct. at 922).[10]  Thus, this Court will once again dismiss the Petition with prejudice as untimely filed.

### V. Certificate of Appealability

The Court will grant a certificate of appealability because jurists of reason would find it debatable whether equitable tolling is appropriate in the circumstances of this case.[11]

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition for Writ of Habeas Corpus (Doc. #12) is **DISMISSED WITH PREJUDICE**.

2.    The Clerk of Court shall enter judgment accordingly and close this case.

3.    If Petitioner appeals this Order, the Court grants a certificate of appealability as stated.

---

[10] In <u>Roper</u>, the Eleventh Circuit noted that ordinary attorney negligence does not warrant equitable tolling and that a "garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline, does not warrant equitable tolling." <u>Roper</u>, 434 F. App'x at 789 (citing <u>Holland</u>, 130 S.Ct. at 2564).

[11] To the extent Petitioner is raising a claim under 18 U.S.C. § 3599(a)(2), the Court would also grant a certificate of appealability.

4.      If Petitioner appeals this Order, Petitioner is entitled to proceed on appeal as a pauper.

**DONE AND ORDERED** at Jacksonville, Florida this 24th day of September, 2013.

TIMOTHY J. CORRIGAN
United States District Judge

ps 9/20
Copies to:
Counsel of Record

19